No. 35,291

WAYNE L. HARSHAW, *Appellee*, v. THE KANSAS CITY PUBLIC SERVICE COMPANY, *Appellant*.

(119 P. 2d 459)

Opinion filed December 6, 1941.

*Fred Robertson, Edward M. Boddington, J. O. Emerson,* all of Kansas City, and *Charles L. Carr,* of Kansas City, Mo., for the appellant.

*William H. McHale* and *Thomas H. Finigan,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action for damages for injuries sustained in a collision between plaintiff's automobile and defendant's bus on a public street in a sparsely settled district in Kansas City.

The street called Rainbow boulevard runs north and south and is paved to a width of 36 feet. There are few buildings thereabout and no cross streets for a distance of several blocks. The street slopes downward towards the north. About 6:30 o'clock a. m., on Decembed 4, 1937, as defendant's bus was traveling rapidly toward the north and plaintiff in his automobile was driving uphill towards the south, the left front fenders of the two vehicles collided. Plaintiff was injured and brought this action for damages.

In his petition plaintiff charged defendant and its bus operator with negligence in these respects: (1) Failure of the operator to look ahead, (2) failure to observe traffic conditions, (3) driving at

high and dangerous rate of speed, to wit, 45 miles per hour without regard for persons and vehicles using the thoroughfare, (4) permitting the bus to turn over to the left of the center of the street, (5) failure to give any warning or signal, (6) and permitting the bus to get out of control.

Plaintiff also pleaded that defendant violated a traffic ordinance of Kansas City enacted in 1931, which limited speed to 35 miles per hour and at no greater speed than is reasonable and proper, having due regard to the traffic conditions of the street and other pertinent circumstances.

Plaintiff alleged that he suffered divers and sundry cuts, wounds and bruises about the face, back and left arm, sacroiliac sprains, internal injuries, and concussion of the brain which rendered him unconscious for three days and partially unconscious until the fifth day after the accident.

Plaintiff also alleged that he was a dancer by profession and that he had sustained special damage because of his inability to continue that kind of work, particularly because of disfigurement of his facial contour.

Plaintiff also alleged that it had been necessary for him to consult several physicians, that he was confined to a hospital for nine days and to his bed at home for ten days, and that at the time he brought this action he was still unable to work. His petition concluded with a prayer for $3,000.

Defendant's answer contained a general denial and a plea of plaintiff's contributory negligence, and alleged that plaintiff was not observing traffic conditions, that he permitted his vehicle to get out of control, and permitted it to turn over to the east of the center of the street so suddenly that a collision of the vehicles was inevitable.

The cause was tried before a jury. Plaintiff testified that at the time of the accident it was dark and his own motor lights and those of the bus and of other vehicles thereabout were burning. The street was dry and he kept to the middle of his unmarked half of the street. He testified:

"Well, the bus was coming down the hill; of course I was coming upward, and he was about the center of the road going downward, and when he got almost to me—I will say about six feet from me—he just cut right into me. It was so rapid I didn't have time to get out of the way, . . .

. . . . . . . . . . . . . . .

"Q. . . . describe to the jury just how that bus turned into your car. A. It was so quick, but I would say it was—he turned slightly left; . . .

and when he got about six—I will say about six feet from him, all at once he just turned right into me and it was so rapid that I don't know what happened afterward.

. . . . . . . . . . . . .

"Q. Now, where was the bus as it came down? A. Well, the bus was on the line; just about on the line coming down, as much as I could remember.

"Q. You mean the left wheels were running on the line and part of the bus over a little on your side? A. I would say that by all means.

. . . . . . . . . . . . .

"Q. So that as you saw the bus approach you knew it was over the center line on your side, did you? A. I didn't know it was away over the center line; it wasn't very exaggerated.

"Q. Well, how much was it? How much did you know it was over the center line? A. Well, I would say about—I would say every bit of a foot and a half to two feet.

. . . . . . . . . . . . .

"Q. When you saw the bus coming down over the line a foot and a half did you continue in the center of your lane and not turn to the right? A. No, when I saw him that far ahead, the place—you see, it was not perfectly light, and when I saw him coming down I saw he was slightly—he was taking all of his part and some of the other; he was—you know, he was up past the bend coming down, and well, I just stayed right in; you know, tried to keep right in the center of my area.

. . . . . . . . . . . . .

"Q. . . . but you did not turn any? A. No. I didn't turn.

"Q. Continued straight ahead? A. Yes.

. . . . . . . . . . . . .

"Q. What part of your car was struck? A. . . . the left fender side, right at the corner."

The jury returned a verdict for $800 in favor of plaintiff and answered special questions, some of which read:

"2. If you find that the defendant's operator was negligent in any respect, state specifically what such negligence was. A. Too fast speed.

. . . . . . . . . . . . .

"5. Where was the bus situated with respect to the center line of Rainbow boulevard at the moment of collision between vehicles? A. Slightly to left or west.

"6. Did the operator of the bus just before the collision turn the bus across the center line of the boulevard over into the west lane? A. Yes."

Defendant filed the usual post-trial motions; these were overruled, and the cause is brought here for review.

It is first contended that defendant was entitled to judgment on the answers to the special questions—particularly the one wherein the jury found that defendant's negligence was "too fast speed." The rule is invoked that in an action for damages for various sorts

of negligence, and the jury expressly finds a specific act of negligence, such a finding absolves the defendant from any and all other acts of negligence charged against him. This rule is sound and frequently applied. (*Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 12 P. 2d 715; *Shepard v. Thompson*, 153 Kan. 68, 109 P. 2d 126.) But a reviewing court is not required to shut its eyes to other special findings of the jury, and these may and sometimes do amplify and supplement the jury's specific finding of negligence. Thus in *Tritle v. Phillips Petroleum Co.*, 140 Kan. 671, 37 P. 2d 996, it was said:

"The fact that a jury, in answer to a special question upon what negligence it based its verdict, stated one kind of negligence, does not preclude reliance on another ground of negligence alleged in the petition and fairly included in answers to other special questions submitted." (Syl. ¶ 3.)

In *Witt v. Roper*, 149 Kan. 184, 86 P. 2d 549, it was said:

"The fact that a jury, in answer to a special question upon what negligence it based its verdict, gave a particular answer which, standing alone, would absolve defendant, does not preclude reliance by plaintiff on another ground of negligence alleged in the petition and fairly included in answers to other special questions submitted." (Syl. ¶ 1.)

See, also, *Springer v. Railroad Co.*, 95 Kan. 408, 148 Pac. 611; *Moorhouse v. Robbins,* 145 Kan. 157, 64 P. 2d 5; *Jacobs v. Hobson,* 148 Kan. 107, 79 P. 2d 861; *Dick's Transfer Co. v. Miller,* post, p. 573 (this day decided).

Fairly considered, we think the jury's findings numbers 2, 5 and 6, quoted above, were in accord with the allegations of the petition and were supported by evidence. While fast speed alone would not have caused the accident, under the circumstances, it cannot be judicially declared that fast speed together with some substantial encroachment on the opposite lane of traffic was not culpable negligence which did cause it.

It is next contended that plaintiff's evidence showed that he was guilty of contributory negligence as a matter of law. This is based on plaintiff's own testimony that although he saw that the bus was using more of the thoroughfare than its half of it, he kept driving straight ahead in the middle of his half the street, when by a slight deviation he would have avoided the collision. The street was 36 feet wide; his lane of traffic was 18 feet wide; driving up the middle of his lane gave a clearance of at least five feet or more between his car and the curb on his right and a similar space between his car and the center line of the street. He testified that the bus was not

using much more than its half of the street—"It wasn't very exaggerated. . . . I would say it was every bit of a foot and a half to two feet."

It is argued that if plaintiff's testimony was accurate and given credence by the jury, the collision could not have happened, and that his testimony convicted himself of contributory negligence. It was defendant's privilege to press this line of argument on the attention of the jury, but it is beyond the province of an appellate court to sift the false or fallacious from the true, and deduce therefrom a conclusion that the jury's function should be dispensed with, and that such a controverted issue of fact as contributory negligence should be ruled on as a matter of law. It is only in clear cases which require no subtleties of reasoning that contributory negligence becomes a matter of law. (*Zumbrun v. City of Osawatomie,* 130 Kan. 719, 288 Pac. 584; id., 135 Kan. 26, 10 P. 2d 3; *Sponable v. Thomas,* 139 Kan. 710, 719-721, 33 P. 2d 721; also cases cited in Hatcher's Kan. Dig. 1623, and Supp. Dig. 375, 376.)

Error is next assigned on the instructions. Plaintiff had alleged that he was a dancer by profession and that his injuries had resulted in his inability to continue in that kind of work, "particularly because of the disfiguration of face and facial contour."

One of the court's instructions reads:

"(17) If you find for the plaintiff, he is entitled to a verdict for such sum as you find from the evidence will reasonably compensate him for all consequences which are the natural and probable results of the injuries sustained by him. In this connection, you are instructed that the plaintiff would be entitled to recover such sum as you find from the evidence will reasonably compensate him for the pain and suffering which you find from the evidence he has been compelled to endure as a natural and probable result of his injury; also loss of earning capacity, loss of time and earnings resulting therefrom; his physical pain and mental anguish caused thereby; and for humiliation or embarrassment to the plaintiff which you may find to be the natural and probable result of scars and disfigurement; and if you further find from the evidence that such injuries, if any you find he sustained, will cause plaintiff to suffer pain and mental anguish in the future, then you will allow him such further sum as you find from the evidence will reasonably compensate him for the pain and suffering which you find he will suffer in the future as a natural and probable result of such injuries, taking into consideration the nature and probable duration thereof; but your entire verdict for the plaintiff cannot exceed the sum of three thousand dollars."

Defendant contends that this instruction would permit a recovery for hospital bills and doctor's bills about which there was no evi-

dence; for special damages for loss of future earnings as a dancer and to which there was no evidence; for anguish and humiliation on account of facial scars about which there were no allegations in plaintiff's petition and no evidence; and for pain and anguish in the future not pleaded and as to which there was no evidence.

Plaintiff seeks to answer these criticisms of this instruction by arguing that the verdict, which was for $800, does not show that any part of it was allowed for hospital bills or doctors' bills, and the damages to plaintiff on account of facial disfiguration were natural and probable consequences. However, since the evidence was that plaintiff had been out of regular employment as a dancer for four or five years (since 1933) and had been on WPA relief employment most of that time, and was so employed at the time of the accident, and that his earnings in that employment before his injury were from $45 to $50 per month, that his injuries confined him to the hospital or his home for about six weeks, since which time he has been earning $80 per month as a WPA worker, it is difficult to discover any basis for a verdict of $800 unless the jury did make substantial allowances for the matters suggested in the criticized instruction irrespective of a want of pertinent pleading or pertinent evidence.

It is elementary that instructions should be germane to the definite issues made by the pleadings and limited to such of them as are supported by *some* evidence, and we are constrained to hold that instruction No. 17 was erroneous in this respect.

Error was also urged against instruction No. 9 which included an excerpt from a city ordinance regulating speed to 35 miles an hour on boulevards. That ordinance was adopted in 1931. The statute of 1937 which took effect on June 30, 1937 (G. S. 1939 Supp. 8-501, *et seq.*) had the effect of abrogating such city ordinances. (*Ash v. Gibson*, 146 Kan. 756, 74 P. 2d 136.) The statute of 1937 does permit cities to regulate speed, but it is not contended that any such regulation adopted by the city pursuant to this later statute was violated by defendant. It is therefore clear that instruction No. 9 should not have been given, although it might be too robust to hold that standing alone it would require a reversal of the judgment.

Error is also urged on the overruling of defendant's motion for a new trial. This motion was based on all the statutory grounds, but the incidents which stand out in the record which may be worthy of note are these:

On direct examination plaintiff testified that he had spent the

night in bed preceding the early morning accident on December 4, 1937. He also swore that he had likewise spent the two previous nights in bed. It was only through persistent cross-examination that he was forced to retract that false testimony and acknowledge that he had not been in bed on any of the three nights preceding the accident, but had attended dances instead, and that he had also worked and drawn pay from the WPA for the three days immediately preceding the accident. This hard-wrung testimony was important because defendant's theory of the accident (with some evidence to support it) was that plaintiff had fallen asleep at the wheel and unconsciously had let his car get into the path of the bus.

At the outset of the trial, plaintiff and his counsel made a bad start seemingly intended to win the sympathy of the jury. After giving his name and address, the record reads:

"Q. Do you have any children? A. Yes, I have five children."

On objection and motion to strike the court ruled: "That is not material; it will be stricken out."

We will come back to this matter when we consider another ground of the motion for a new trial based on misconduct of a member of the jury. On their *voir dire,* all the jurors were asked this question: "Have any of you ever had any claim or suit for damages?" If so, they were asked to raise their hands. Mrs. Vashta Roler did not raise her hand or otherwise indicate that she ever had a claim or suit for damages, and she was accordingly accepted as a juror. In support of the motion for a new trial, the foreman of the jury made an affidavit "that Mrs. Vashta Roler, a colored woman, was also on the jury and that during the deliberations of the jury she stated that the plaintiff [also colored] had five children." This same Mrs. Roler was called to serve as a juror on another damage suit against this defendant and again she averred on her *voir dire* that she had never had any lawsuits against any person, corporation or city. On closer questioning, however, she admitted that she had two little girls which were thrown off the bus, and that "they just came out to the house and paid for the damage." Pressing this examination more closely, Mrs. Roler was forced to admit that she had filed a suit against the city, but not against the bus company.

These incidents well fortified by affidavits were shown in support of the motion for a new trial in the instant case; also that through her false answers on *voir dire* defendant accepted her as a disin-

terested and impartial juror. We think her presence on the jury, under the circumstances, together with her manifest disregard of the court's admonition that plaintiff having five children should not be considered, tended to support defendant's motion for a new trial. We have said above that plaintiff's testimony that he kept to the middle of the lane of traffic and that the bus's encroachment thereon was 1½ to 2 feet did not show contributory negligence as a matter of law. We are compelled to say, however, that the true facts as to how the accident did occur and defendant's negligence in respect thereto have not been shown with sufficient clarity to permit this judgment to stand. This case in some respects is like that of *State v. McLemore,* 101 Kan. 259, 166 Pac. 497, where a number of errors were committed, no one of which standing alone was very serious, but which considered together constrained this court to the conclusion that defendant had not had a fair trial and a new trial was ordered.

It is so here. The judgment is reversed and the cause remanded for a new trial.